IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

FRANK LEE M.,[1]  )
 )
       Plaintiff,  )
 )
vs.  ) Civil No. 18-cv-618-CJP[2]
 )
COMMISSIONER OF SOCIAL  )
SECURITY,  )
 )
       Defendant.  )

## **MEMORANDUM and ORDER**

In accordance with 42 U.S.C. § 405(g), plaintiff seeks judicial review of the final agency decision denying his application for disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## **Procedural History**

Plaintiff applied for benefits in August 2016, alleging disability beginning on April 15, 2011. He later amended the alleged onset date to May 22, 2014. (Tr. 222).

After holding an evidentiary hearing, ALJ Stuart T. Janney denied the application in a written decision dated October 4, 2017. (Tr. 15-27). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] In keeping with the court's recently adopted practice, plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition pursuant to 28 U.S.C. § 636(c). See, Doc. 17.

1

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ's assessment of plaintiff's RFC was not supported by substantial evidence because he erred in weighing the opinions of the consultative examiner and the state agency reviewers; he "played doctor;" and he did not articulate his reasoning

2. The ALJ did not properly evaluate plaintiff's testimony.

3. The ALJ failed to develop the record.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[3] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. § 404.1572.

---

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009).

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of judicial review is limited. "The findings of

the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## **The Decision of the ALJ**

ALJ Janney followed the five-step analytical framework described above. He determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date. He was insured for DIB only through

September 30, 2014.[4] He found that plaintiff had severe impairments of degenerative disc disease; left carpal tunnel syndrome; attention deficit hyperactivity disorder; adjustment disorder with depressed mood; major depressive disorder; persistent depressive disorder with persistent major depressive episode, with psychotic mood incongruent psychosis; generalized anxiety disorder; social anxiety disorder; personality disorder, cluster B; and cannabis and methamphetamine use disorder. These impairments did not meet or equal a listed impairment.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the light exertional level, limited to frequent handling and performing fine finger manipulation with the non-dominant left upper extremity; understanding and remembering only simple and detailed instructions, but not complex instructions; performing simple and detailed tasks, but not complex tasks; tolerating occasional contact with co-workers and supervisors; no contact with the public; and not performing fast-paced tasks with strict production quotas, but he can perform variable paced tasks with end-of-day production quotas.

Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do his past relevant work. However, he was not disabled because he was able to do other jobs which exist in significant numbers in the local and national economies.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in

---

[4] The date last insured is relevant only to the claim for DIB.

formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.

### 1. Agency Forms

Plaintiff was born in 1969. He was 48 years old on the date of the ALJ's decision. (Tr. 239). He alleged disability based on a number of problems, including degenerative disc disorder, ADHD, memory problems, anxiety, depression, and substance abuse. (Tr. 244).

In December 2014, plaintiff worked for a short time doing data entry. From August to October 2015, plaintiff worked as a prep cook at a Jack in the Box restaurant. He said both these jobs ended because of his mental and physical conditions. (Tr. 227-231). He had worked as a carpenter from 1993 to 2008. He had also done data entry for call centers. (Tr. 246).

### 2. Evidentiary Hearing

Plaintiff was represented by an attorney at the evidentiary hearing in September 2017. (Tr. 35).

Plaintiff testified that he was divorced and lived with his mother. He had a medical card from Illinois. All his prescribed treatment was covered except for Adderall. (Tr. 39-40). He had a substance abuse problem in the past but had not used drugs since he moved in with mother in August 2016. (Tr. 47-48).

Plaintiff had pain in his low back and his left ankle. He had pain in both shoulders and difficulty using his left hand. (Tr. 49-50).

Plaintiff did not do much around the house. He tried cooking, but he got

confused and had anxiety attacks. He cried two or three times a day. He sometimes heard voices calling his name. He had been carrying a suicide note around in his pocket for a month. He did not want to be alone, but he also was afraid to be around people. He spent his time sitting around the house or playing with his dogs. He rode to Walmart with his mother so his dogs could have a ride. He stayed in the car with the dogs. He had panic attacks. (Tr. 50-53).

Plaintiff's mother testified that he had no more problems with substance abuse. He had memory problems and cried every day. He did very little around the house. (Tr. 60-61).

A vocational expert (VE) also testified. The ALJ asked the VE a hypothetical question based on the ultimate RFC assessment. The VE testified that this person could not do plaintiff's past work, but could do jobs at both the light and sedentary levels that exist in significant numbers in the national economy. He also testified that an employer would generally tolerate no more than 15% off-task behavior. In addition, competitive work would be precluded if a worker required more than normal supervision to remain on task. (Tr. 63-66).

### 3. Medical Treatment

Plaintiff lived in Oregon before he moved in with his mother in Illinois. He was treated at Umpqua Medical Center in Roseburg, Oregon, from May 2014 to May 2016. (Tr. 369-426).

The amended date of onset, May 22, 2014, was plaintiff's first visit to Umpqua. He saw Dr. Metcalf with complaints of right elbow pain since falling off a bike and "mental issues." He said his brother recently died and his wife was

divorcing him, and he "just cries all the time." He was asking for medication for ADHD and Ativan for depression. On exam, he was alert and oriented. He had a normal mood and affect, and insight and judgment were intact. He was tearful. Dr. Metcalf prescribed Fluoxetine (Prozac). (Tr. 397-399).

He was seen again for elbow pain and other transient physical complaints in June and July 2014. (Tr. 389-396). In September 2014, he said Fluoxetine was not strong enough. Dr. Metcalf increased the dosage. (Tr. 386-387).

Plaintiff saw Dr. Metcalf in December 2015, complaining of hearing voices for the last six months or so. He had not seen a mental health provider for a year. He used marihuana daily. Dr. Metcalf prescribed Zyprexa and referred him to Dr. Mendelson. (Tr. 376-379).

In January 2016, plaintiff was seen at Umpqua for a mental health assessment. Plaintiff said that he had started hearing voices two years prior while he was in jail. He had been using drugs, including meth, very heavily, and wondered if that is what started the voices. He described patterns of depression for the last eight years since he had not been working, but it was recently more severe. He used marihuana daily and had been using meth off and on for twenty years. He was going to turn himself in that day; he said he was going to jail for missing some court dates. (Tr. 424-426).

Dr. Mendelson saw him on January 26, 2016. He reported a history of depression, ADHD, and "unspecified psychosis." On exam, attention was poor. His speech had a stop and start pattern. He was fidgety. His affect was cheerful, but he broke into tears when Dr. Mendelson confronted him about his inability to

8

stay on track. He appeared depressed. His through processes were poorly organized in that he would shift discussion, digress, and not pick out the salient factor in conversation or questions. Dr. Mendelson thought that plaintiff had very severe ADHD manifesting as depression and phobia in social situations. He thought that the voices plaintiff heard were caused by meth and possibly ecstasy. Dr. Mendelson wanted to prescribe Vyvanse but could not because plaintiff tested positive for meth and ecstasy. He had to have a month of clean drug tests before the doctor would prescribe Vyvanse. He prescribed Fluoxetine. (Tr. 418-423). In March 2016, plaintiff tested negative for methamphetamine, and Dr. Mendelson wanted to prescribe Vyvanse. In April, Dr. Mendelson noted that his insurance refused to pay for Vyvanse until he completed a substance abuse treatment program. Plaintiff agreed to start the program. (Tr. 413-417).

Plaintiff began receiving heath care at Southern Illinois Healthcare in Salem, Illinois in December 2016. He was seen by Nurse Practitioner Paul Williams. He said he had recently moved to the area and that he had been taking Vyvanse for ADHD. He also complained of upper back pain. On exam, he was oriented, but was anxious, depressed, and tearful. NP Williams prescribed Vyvanse and Adderall for ADHD and Sertraline (Zoloft) for mixed anxiety and depressive disorder, as well as Flexeril and Naprosyn for cervical radiculopathy. He referred plaintiff to "Sharon" for psychiatric issues. In January 2017, NP Williams added Clonazepam for anxiety and depressive disorder. In March, plaintiff asked NP Williams to increase the dose of Adderall, Clonazepam, and Zoloft. He was again depressed, tearful, and restless, but his memory was normal. NP Williams

instructed him to keep his appointment with Sharon, and that she would adjust his medications. (Tr. 428-437).

Plaintiff was hospitalized overnight because of suicidal ideation in January 2017. His wife had divorced him six months earlier because of his meth abuse. She then moved to Oregon. Two weeks earlier, she changed her phone number. He felt depressed and frustrated and had some suicidal ideation, although he denied current suicidal ideation or plan. A drug screen was positive for amphetamines and cannabinoids. It was noted that he was taking "amphetamine-dextroamphetamine (ADDERALL)." He was discharged in improved condition. (Tr. 452-464).

Plaintiff saw Clinical Nurse Specialist Sharon Szatkowski at Southern Illinois Healthcare four times between late March and early August 2017. (Tr. 483-486, 476-480, 472-476, 517-520). At the first visit, he said he wakes up and cries for two hours. He was tearful, and he talked about "different things." On exam, his behavior was agitated, impulsive, and guarded. His speech was fluent and of normal volume. He was oriented and his memory was intact. His mood was sad, irritable, and labile. Affect was anxious, sad, and tearful. He had flight of ideas and racing thoughts. CNS Szatkowski diagnosed major depressive disorder, PTSD, bipolar disorder, ADHD, and panic disorder. She continued him on the same medications. (Tr. 485-486). In May 2017, he reported that he had less anxiety and had been able to complete some things. She observed that his behavior was cooperative but impulsive. He was oriented and memory was intact. His mood was sad, irritable, and labile. Affect was anxious, sad, and tearful. His

thought process and motor activity were intact. She added Trazodone for insomnia. (Tr. 478-479).

In June 2017, plaintiff reported to CNS Szatkowski that he still cried every morning when he awoke, but he denied ups and downs. His mother reported that he did have ups and downs, but not as bad as before. Plaintiff or his mother reported that he was keeping busy but did not complete things. His mother said he "quit going places and stays home all the time." He had "a lot of suicidal thoughts." On exam, plaintiff's behavior was agitated, and his speech was loud and pressured. He was oriented and his memory was intact. His mood was sad, irritable, and labile. Affect was anxious, sad, and tearful. Judgment was impaired and he had flight of ideas and suicidal ideation. The dosage of Latuda was increased for mood stabilization and Trazodone was increased to help with sleep. (Tr. 472-476).

At the last visit in August 2017, plaintiff reported that he was still crying one to three times a day. He had a two week "burst of energy where he was jumping from one thing to another, going and going and could not stop." He had racing thoughts, some mood swings and suicidal thoughts two to three times a week. He was very anxious with sweaty palms for the first hour he was awake. On exam, his speech was pressured and he was hypertalkative. Mood was normal and affect was happy, pleasant, and congruent to thought content. He had flight of ideas and racing thoughts. CNS Szatkowski added a new diagnosis of generalized anxiety disorder. She instructed him to taper off Latuda and to discontinue Zoloft. He

was to take Prozac and Zyprexa "to make symbax [sic] for mood stabilization."[5] He was to return in early September. (Tr. 517-520).

4. **Consultative Exam**

In November 2016, Jerry L. Boyd, Ph.D., performed a consultative psychological exam at the request of the agency. At that time, plaintiff was not taking any psychotropic drugs. Plaintiff cried several times during the exam. His attention, concentration, and short-term memory showed very mild impairment. Thought processes were normal. He had no hallucinations or delusions. His speech was somewhat stiff and mechanical. He reported anxiety. Dr. Boyd diagnosed major depressive disorder, recurrent; methamphetamine use disorder, severe, in reported remission; and personality disorder. He opined that plaintiff could follow moderately complex instructions, "though he may require repetition due to attention deficits." He said that plaintiff "appears to have a very reduced frustration tolerance and reduced persistence related to the major depressive and anxiety symptoms." With regard to his ability to sustain concentration and persist, Dr. Boyd stated that plaintiff's pace of mentation was within normal limits but was "interrupted by emotionality." He was able to focus and concentrate with mild impairments. With regard to his ability to maintain effective social interaction, Dr. Boyd said that plaintiff reported that he avoided others and was uncomfortable around strangers, and that he seemed to have difficulty controlling his sadness and tears. (Tr. 360-364).

---

[5] The correct spelling of the drug is Symbyax. It is a combination of generic Prozac and Zyprexa See, https://www.drugs.com/symbyax.html, visited on February 21, 2019.

### 5. State Agency Consultants' RFC Assessments

In November 2016, state agency consultant Michael Cremerius, Ph.D., assessed plaintiff's mental RFC based on a review of the record. (Tr. 80-82). He concluded that plaintiff was not significantly limited in ability to carry out short and simple instructions; ability to perform activities within a schedule, maintain regular attendance, and be punctual; and ability to sustain an ordinary routine without special supervision. He was moderately limited in ability to carry out detailed instructions; to maintain attention and concentration for extended periods; work in coordination with or in proximity to others; interact with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers; and respond to changes in the workplace. In his narrative explanation, Dr. Cremerius said that plaintiff was capable of performing "simple and detailed tasks," and he was limited to occasional contact with coworkers and supervisors, no contact with the public, and no fast-paced tasks with strict production quotas.

A second state agency consultant reviewed the record in December 2016 and agreed with Dr. Cremerius. (Tr. 107-109).

### Analysis

Plaintiff first argues that the ALJ erred in the weight he assigned to the opinions of Dr. Boyd and the state agency reviewers.

The ALJ gave "great weight" to the state agency reviewers, but only "some weight to Dr. Boyd's opinion. He explained that he gave greater weight to the state agency reviewers' opinions because "they are experts in their field and in the

13

Regulations. Moreover, [they] reviewed all evidence in the file that was available to them at that time."

The ALJ is required to weigh medical opinion by considering the factors listed in 20 C.F.R. § 404.1527(c). The opinion of a doctor who examined the claimant is generally entitled to more weight than that of a doctor who did not examine him. § 404.1527(c)(1). Further, Dr. Boyd was acting as a state agency consultant when he examined plaintiff. As such, he is unlikely to exaggerate his disability. *Garcia v. Colvin*, 741 F.3d 758, 761 (7th Cir. 2013).

As was detailed above, Dr. Boyd concluded that plaintiff has mental limitations that impact his ability to do work-related mental functions. He said that plaintiff may require repetition due to attention deficits, that he appears to have a very reduced frustration tolerance and reduced persistence, and that his pace of mentation was "interrupted by emotionality." He also had limitations in maintaining effective social interaction.

"[R]ejecting or discounting the opinion of the agency's own examining physician that the claimant is disabled, as happened here, can be expected to cause a reviewing court to take notice and await a good explanation for this unusual step." *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014). See also, *Vanprooyen v. Berryhill*, 864 F.3d 567, 572 (7th Cir. 2017). While Dr. Boyd did not explicitly opine that plaintiff was disabled, he did conclude that he has deficits in attention, persistence, and pace that would affect his ability to work. The VE testified that an employer would generally tolerate no more than 15% off-task behavior and that competitive work would be precluded if a worker required more than normal

14

supervision to remain on task. The reasons given by the ALJ for discounting Dr. Boyd's opinion do not add up to a good explanation.

The ALJ said that he gave Dr. Boyd's opinion only "some weight," noting that Dr. Boyd "used the claimant's subjective complaints in his analysis of the claimant's abilities instead of the psychological examination." (Tr. 23). However, "psychiatric assessments normally are based primarily on what the patient tells the psychiatrist," so that is not a good reason to discount the opinion. *Price v. Colvin*, 794 F.3d 836, 840 (7th Cir. 2015). The ALJ gave no other explanation.

In addition, as plaintiff argues, the ALJ's decision to give great weight to the state agency reviewers' opinions is faulty because they did not have the opportunity to consider his later treatment at Southern Illinois Healthcare Foundation.

In *Stage v. Colvin*, 812 F.3d 1121 (7th Cir. 2016), the Seventh Circuit held that the ALJ erred in accepting a reviewing doctor's opinion where the reviewer did not have access to later medical evidence containing "significant, new, and potentially decisive findings" that could "reasonably change the reviewing physician's opinion." *Stage*, 812 F.3d at 1125. In a later case, the Seventh Circuit reiterated the rule. "An ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018), as amended on reh'g (Apr. 13, 2018). See also, *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018).

The treatment records from Southern Illinois Healthcare Foundation suggest that plaintiff has deficits in maintaining attention, persistence, and pace, despite

taking a number of psychotropic medications. On this record, it is certainly reasonable to conclude that those records could have changed the state agency reviewers' opinions.

Lastly, the Court agrees that the ALJ did not properly assess the reliability of plaintiff's subjective statements.

SSR 16-3p supersedes the previous SSR on assessing a claimant's credibility. SSR 16-3p became effective on March 28, 2016 and should be applied by the ALJ in any case decided on or after that date. 2017 WL 5180304, at *1.

SR 16-3p eliminates the use of the term "credibility," and clarifies that symptom evaluation is "not an examination of an individual's character." *Ibid.*, at *2. "Adjudicators must limit their evaluation to the individual's statements about his or her symptoms and the evidence in the record that is relevant to the individual's impairments. In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation." *Ibid.*, at *11. SSR 16-3p continues to require the ALJ to consider the factors set forth in the applicable regulation, 20 C.F.R. § 404.1529. *Ibid.*, at *10.

The new SSR does not purport to change the standard for evaluating the claimant's allegations regarding his symptoms. Thus, prior Seventh Circuit precedents continue to apply.

The findings of the ALJ as to the accuracy of the plaintiff's allegations are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). However, Social

Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.

The ALJ is required to give "specific reasons" for his findings in this area. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). It is not enough just to describe the plaintiff's testimony; the ALJ must analyze the evidence. *Ibid*. See also, *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009).

Here, the ALJ said that plaintiff's statements "are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. 21). However, the reasons he gave are insufficient. The ALJ said that plaintiff's mental health problems improved with medications and abstention of drug use, but CNS Szatkowski's notes indicate that plaintiff continued to have considerable mental health problems and she was continuing to adjust his medications in search of the right combination and dosage. The ALJ also pointed out that plaintiff "is able to ride to Walmart with his mother," but this does not contradict plaintiff's statements. Similarly, his ability to do "personal care" and "some household chores" does not contradict his claim of serious mental health symptoms.

The Court must conclude that ALJ Janney failed to build the requisite logical bridge between the evidence and his conclusions. Remand is required where, as

here, the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying plaintiff's application for social security disability benefits is REVERSED and REMANDED to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE: February 22, 2019.**

                                          s/ Clifford J. Proud
                                          **CLIFFORD J. PROUD**
                                          **UNITED STATES MAGISTRATE JUDGE**